IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| WIND TOWER TRADE COALITION, | ) | |
| | ) | PUBLIC VERSION |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 24-00070 |
| | ) | |
| UNITED STATES, | ) | ███████████████ |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DONGKUK S&C CO. LTD., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                          STEPHEN C. TOSINI
Jesus Saenz                          Senior Trial Counsel
Attorney                             United States Department of Justice
Office of the Chief Counsel for Trade  Civil Division
Enforcement and Compliance           P.O. Box 480, Ben Franklin Station
United States Department of Commerce  Washington, D.C. 20044
                                     Tel: (202) 616-5196
                                     Fax: (202) 305-2062
                                     Email: stephen.tosini@usdoj.gov

December 18, 2024                     Attorneys for Defendant

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____
                                        )
WIND TOWER TRADE COALITION,             )
                                        )
                   Plaintiff,           )
                                        )
        v.                              )
                                        )
UNITED STATES,                          )
                                        )
                   Defendant,           )
                                        )
        and                             )
                                        )
DONGKUK S&C CO. LTD.,                    )
                                        )
                   Defendant-Intervenor. )
_____)

**ORDER**

On consideration of plaintiff's motion for judgment on the administrative record,

defendant's response, and all other pertinent papers, it is hereby

ORDERED that the motion is denied; and is further

ORDERED that judgment is entered for the United States.


Dated: _____            _____
       New York, NY                             SENIOR JUDGE

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ................................................................................1

    I.    Administrative Determination Under Review ..........................................................1

    II.   Issue Presented For Review .....................................................................................2

STATEMENT OF THE FACTS...........................................................................................2

    I.    Legal Framework .....................................................................................................2

    II.   Procedural Background.............................................................................................4

SUMMARY OF THE ARGUMENT ...................................................................................6

ARGUMENT .......................................................................................................................7

    I.    Standard of Review...................................................................................................7

    II.   The Final Results Are Supported By Substantial Evidence.....................................9

        A.  DKSC Correctly Reported Its Conversion Costs................................................9

        B.  Commerce's Decision Not to Adjust DKSC's Reported Conversion Costs is
            Supported by Substantial Evidence ...............................................................12

        C.  Commerce Did Not Depart From Its Practice When It Refrained from
            Adjusting Differences In Conversion Costs....................................................16

CONCLUSION....................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                            **Page(s)**

*Apex Frozen Foods Priv. Ltd. v. United States*,
   862 F.3d 1337 (Fed. Cir. 2017) ................................................................................. 8

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ................................................................................. 8

*BlueScope Steel, Ltd. v. United States*,
   719 F.Supp.3d 1357 (Ct. Int'l Trade 2024) ............................................................. 17

*Cleo Inc. v. United States*,
   501 F.3d 1291 (Fed. Cir. 2007) ................................................................................. 8

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ................................................................................................. 7

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ................................................................................................. 7

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................................... 8

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ........................................................... 8

*Haixing Jingmei Chem. Prod. Sales Co. v. United States*,
   335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) ......................................................... 11

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ................................................................................................. 8

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ........................................................................................... 11

*NEXTEEL Co. v. United States*,
   355 F. Supp. 3d 1336 (Ct. Int'l Trade 2019) ........................................................... 3

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ................................................................................. 7

*NMB Sing. Ltd. v. United States*,
   557 F.3d 1316 (Fed. Cir. 2009) ............................................................................... 18

*PSC VSMPO-Avisma Corp. v. United States*,
   688 F.3d 751 (Fed. Cir. 2012) ........................................................ 8

*Shandong Huarong Mach. Co. v. United States*,
   29 CIT 484 (Ct. Int'l Trade 2005) ................................................ 18

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
   203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) ................................. 8

*Stanley Works Fastening Sys. Co., Ltd. v. United States*,
   279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ................................. 8

*Thai Plastic Bags Indus. Co. v. United States*,
   746 F.3d 1358 (Fed. Cir. 2014) ................................................. 3, 10

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995) ........................................................ 2

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ....................................................................... 7

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998) ..................................................... 8

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   50 F.4th 98 (Fed. Cir. 2022) .......................................................... 2

**Statutes**

19 U.S.C. § 1516a(b) ........................................................................... 7

19 U.S.C. § 1675(a) .............................................................................. 2

19 U.S.C. § 1677(15) ........................................................................... 3

19 U.S.C. § 1677b(a) ........................................................................... 2

19 U.S.C. § 1677b(b) ........................................................................... 3

19 U.S.C. § 1677b(f) ................................................................... *passim*

**Administrative Determinations**

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
   87 Fed. Reg. 61278-02 (Dep't of Commerce Oct. 11, 2022) ..................................................... 4

*Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist
   Republic of Vietnam: Antidumping Duty Orders*,
   85 Fed. Reg. 52,546 (Dep't of Commerce Aug. 26, 2020) ....................................................... 4

*Utility Scale Wind Towers from Indonesia: Final Determination of Sales at Less Than Fair Value
   and Final Negative Determination of Critical Circumstances*,
   85 Fed. Reg. 40,231-01 (Dep't of Commerce Jul. 6, 2020) ............................................. *passim*

*Utility Scale Wind Towers From the Republic of Korea*, *Final Results of Antidumping Duty
   Administrative Review; 2021-2022,*
   89 Fed. Reg. 16,544 (Dep't of Commerce Mar. 7, 2024) ........................................................... 1

*Utility Scale Wind Towers From The Republic of Korea: Final Results of Antidumping Duty
   Administrative Review; 2021-2022; Correction*,
   89 Fed. Reg. 22,372-03 (Dep't of Commerce Apr. 1, 2024) ..................................................... 2

*Utility Scale Wind Towers from the Republic of Korea: Preliminary Results of Antidumping Duty
   Administrative Review and Preliminary Determination of No Shipments; 2021-2022*,
   88 Fed.  Reg. 60,929 (Dep't of Commerce Sept. 6, 2023) ....................................................... 5

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LEO M. GORDON, SENIOR JUDGE

| | | |
|---|---|---|
| WIND TOWER TRADE COALITION, | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 24-00070 |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| DONGKUK S&C CO. LTD., | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully responds to the motion for judgment on the agency record submitted by plaintiff, Wind Tower Trade Coalition (WTTC), challenging the final results of the 2021-22 administrative review of the antidumping duty order covering utility scale wind towers from the Republic of Korea.  WTTC Br., ECF No. 24.  As demonstrated below, Commerce's final results are supported by substantial evidence, in accordance with law, and should be sustained.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The determination under review is the final results of the 2021-22 administrative review of the antidumping duty order on *Utility Scale Wind Towers From the Republic of Korea*, 89 Fed. Reg. 16,544 (Dep't of Commerce Mar. 7, 2024) (Final Results) (P.R. 96), as corrected in *Utility*

*Scale Wind Towers From The Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2021-2022; Correction*, 89 Fed. Reg. 22,372 (Dep't of Commerce Apr. 1, 2024) (P.R. 99), and accompanying Issues and Decision Memorandum (IDM) (P.R. 92).

## II.    Issue Presented For Review

Whether Commerce's decision not to adjust Dongkuk S&C Co. Ltd.'s (DKSC) reported conversion costs is supported by substantial evidence.

## STATEMENT OF THE FACTS

## I.    Legal Framework

The statute directs Commerce in antidumping proceedings to determine whether subject merchandise is being, or is likely to be, sold at less than fair value by comparing the United States price for imported merchandise (known as export price or constructed export price as the case may be) with the merchandise's home market price (called normal value in the statute).  19 U.S.C. § 1675(a)(2)(A).  The statute further directs that "a fair comparison shall be made between the export price or constructed export price and normal value."  19 U.S.C. § 1677b(a); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (explaining that the statutory framework seeks "to produce a fair . . . comparison between foreign market value and United States price").  To this end, Commerce identifies the subject merchandise's commercially significant physical characteristics and uses them to establish control numbers or CONNUMs for sales comparison purposes.  *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 102 (Fed. Cir. 2022) ("Commerce defines CONNUMs by identifying 'key physical characteristics of the subject merchandise' that are 'commercially meaningful' in the United States marketplace and 'have an impact on costs of production.'").

When calculating normal value for antidumping comparisons, the statute authorizes Commerce to disregard sales if they have been made at less than the "cost of production" of the product.  19 U.S.C. §§ 1677b(b), 1677(15)(A).  The cost of production as the amount equal to the sum of "the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business."  19 U.S.C. § 1677b(b)(3)(A).  Commerce relies on a company's normal books and records for purposes of calculating cost of production (and constructed value) if they satisfy two conditions:  "**{1}** if such records are kept in accordance with the generally accepted accounting principles {(GAAP)} of the exporting country (or the producing country, where appropriate) and **{2}** reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).

When the costs reported in a company's books are not reasonable—for example, if cost differences among products do not represent differences in their physical characteristics—Commerce may revise the costs.  It is thus normal for Commerce to adjust costs to address distortions when it encounters cost differences that are attributable to factors beyond differences in the products' physical characteristics.  *See*, *e.g.*, *Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014) (explaining that, "if Commerce determines that costs reported by a respondent are 'shifted away from the production of the subject merchandise, or the foreign like product,' Commerce has the authority to 'adjust costs appropriately to ensure that {the costs} are not artificially reduced.'" ); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d 1336, 1361-62 (Ct. Int'l Trade 2019) ("{i}f factors beyond the physical characteristics influence the costs, however, Commerce will normally adjust the reported costs in order to reflect the costs that are based only on the physical characteristics.").

DKSC reported conversion costs on a monthly basis based on the amount of effort undertaken for converting steel plate into a wind tower.  IDM at 18-21; C.R. 37 at SD-25-27; C.R. 39 at 59-116 (supporting exhibits).  WTTC contends that this effort-based reporting in DKSC's books and records does not "reasonably reflect the costs associated with the production and sale of the merchandise," under 19 U.S.C. § 1677b(f)(1)(A).  WTTC Br. at 1.  Presumably, under WTTC's proposed methodology, more sales would fail to meet the section 1677b cost of production threshold and would be disregarded, raising normal value, and thus increasing the duty owed.

## II.    Procedural Background

Commerce published an antidumping (AD) order on utility scale wind towers (wind towers) from the Republic of Korea (Korea).  *Utility Scale Wind Towers from Canada, Indonesia, the Republic of Korea, and the Socialist Republic of Vietnam: Antidumping Duty Orders*, 85 Fed. Reg. 52,546 (Dep't of Commerce Aug. 26, 2020) (*Order*).

In response to Commerce's notice for requests for administrative reviews, Commerce received requests from WTTC and DKSC to review DKSC, and Commerce initiated the requested review.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 61278 (Dep't of Commerce Oct. 11, 2022) (*Initiation Notice*).  Commerce selected DKSC as the sole mandatory respondent because it was the only exporter with suspended entries of subject merchandise during the period of review (POR). P.R. 18.  Commerce issued its initial questionnaire to DKSC to which DKSC timely responded.  DKSC Section A Questionnaire Response (Dec. 12, 2022) (DKSC AQR) (P.R. 29-32, C.R. 4-9); DKSC's Sections B, C, D Questionnaire Response (Jan. 3, 2023) (P.R. 36-38, C.R. 11-16) (DKSC's Section B-D Response).  Commerce later issued supplemental questionnaires, to which DKSC responded.

*See*, *e.g.*, DKSC's Section B-D Response at D-2 (P.R. 36-39, C.R. 11-16).  In response to

Commerce's supplemental questionnaire regarding the cost of production, DKSC reported its

conversion costs for the process of converting steel plate into wind towers as including "direct

labor, indirect variable overhead, and fixed overhead costs."  C.R. 37 at SD-25-27; C.R. 39 at 59-

116 (supporting exhibits).  DKSC reported dividing variable overhead costs into direct variable

overhead costs linked to specific projects and into indirect variable costs that are "not impacted

by differences in production characteristics," such as accounting for scrap offsets.  *Id*.

WTTC commented ahead of the *Preliminary Results*, contending that DKSC's conversion

costs were "unrelated to the physical characteristics of the wind tower."  WTTC Pre-Preliminary

Comments (July 10, 2023), (C.R. 45-46), P.R. 62) at 3.  WTTC asserted that the "overall weight

averaged variation of the conversion costs for all CONNUMs was [▮▮▮▮]%."  *Id*.  To support its

claim, WTTC included an analysis of DKSC's reported conversion costs.  *Id*. at Ex. 1.  This

analysis included DKSC's reported conversion costs by CONNUM, provided the number of

sections sold per CONNUM, calculated the average variation of conversion costs per section of

each CONNUM, and determined the number of sections, per CONNUM, for which the variation

in average conversion costs exceeded 10 percent.  *Id*.

Commerce preliminarily found dumping.  *Utility Scale Wind Towers from the Republic of*

*Korea: Preliminary Results of Antidumping Duty Administrative Review and Preliminary*

*Determination of No Shipments; 2021-2022*, 88 Fed.  Reg. 60,929 (Dep't of Commerce Sept. 6,

2023) (*Preliminary Results*) (P.R. 71), and accompanying Preliminary Decision Memorandum

(PDM) (P.R. 69).  Commerce did not adjust DKSC's conversion costs.  The parties then filed

case and rebuttal briefs with Commerce.

Among other things, WTTC contended that Commerce should reallocate DKSC's conversion costs to mitigate cost differences that are not associated with physical characteristics of reported merchandise.  WTTC Case Br. at 1 (P.R. 82, C.R. 59).  WTTC maintained that DKSC's allocation methodology of conversion costs on a monthly basis by dividing by production quantity is unrelated to the physical characteristics of reported merchandise and results in significant variation of conversion costs across CONNUMs, thus establishing a need to allocate conversion costs across all products.  *Id*. at 4.  In response, DKSC asserted that Commerce should not apply WTTC's proposed adjustments to DKSC's conversion costs and, instead, that Commerce should continue to allocate DKSC's conversion costs on a project-specific basis.  DKSC's Rebuttal Case Br. at 3 (P.R. 86, C.R. 60) (citing WTTC Case Br. at 2-4).  DKSC maintained that introducing any type of smoothing methodology to DKSC's conversion costs would be inaccurate due to the project-specific nature of DKSC's cost accounting and reporting.  *Id*. at 4 (citing DKSC's Sections B-D Response at D-13 (P.R. 38, C.R. 15)).

Commerce disagreed with WTTC and in the final results did not reallocate DKSC's conversion costs.  IDM at 20.  Commerce found that DKSC's reported conversion costs to be appropriate based on its reporting methodologies and its own cost accounting system.  *Id* at 21.

## SUMMARY OF THE ARGUMENT

WTTC challenges Commerce's use of DKSC's reported conversion costs in dumping margin calculations on the grounds that (1) Commerce incorrectly interpreted and applied the statutory language regarding whether DKSC's records reasonably reflected the costs associated with the production and sale of subject merchandise; (2) Commerce failed to articulate a rational connection between the cost impact of internal components on CONNUMs and the decision to accept DKSC's conversion costs; and (3) Commerce unlawfully departed from its practice when

it failed to adjust differences in conversion costs that were unrelated to the physical characteristics of the subject merchandise.

Contrary to WTTC's contentions, the final results are supported by substantial evidence. First, Commerce followed 19 U.S.C. § 1677b(f)(1)(A) by analyzing whether and concluding that DKSC's reported conversion costs based on its normal books and records reasonably reflected the costs associated with the production and sale of wind towers. Second, Commerce relied on substantial record evidence to conclude that the variance identified by the WTTC was reasonably related to the cost differences of the wind towers' physical characteristics. Third, Commerce did not unlawfully depart from its practice when it declined to adjust differences in conversion costs because the record supports Commerce's finding that the identified cost differences were related to the wind towers' physical characteristics.

ARGUMENT

## I.    Standard of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir.

7

2006) (cleaned up), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984).

Additionally, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgment in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (cleaned up).

In a similar vein, the Court affords Commerce "tremendous deference" when Commerce exercises its technical expertise to make "complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012) (citations omitted). This is true in the antidumping context because such "determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts." *Stanley Works Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1185 (Ct. Int'l Trade 2017) (quoting *PSC VSMPO–Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012), cited in *Apex*

*Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1347 (Fed. Cir. 2017)). Moreover, it is not necessary for Commerce to provide an explicit explanation so long as its path is reasonably discernible. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998).

## II.    The Final Results Are Supported By Substantial Evidence

### A.    DKSC Correctly Reported Its Conversion Costs

DKSC reported its conversion costs in accordance with 19 U.S.C. § 1677b(f)(1)(A).  The statute imposes two conditions for the use of reported costs in cost calculations:  "Costs shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A). Substantial record evidence establishes that DKSC's contested costs satisfied both conditions.

First, WTTC does not contest Commerce's finding at page 20 of the IDM that DKSC's records are kept in accordance with the exporting country's  GAAP in accordance with 19 U.S.C. § 1677b(f)(1)(A).

Second, Commerce found that DKSC's reported conversion costs "reasonably reflect the cost associated with the production and sale of the merchandise."  IDM at 20-21 (citing 19 U.S.C. § 1677b(f)(1)(A)).  Indeed, Commerce found no basis to reallocate DKSC's conversion costs based on WTTC's argument because WTTC's analysis "does not consider that the CONNUMs vary in complexity with regard to bus bars, conduits, elevators, platforms, and other internal components, all of which are reflected in the CONNUM and impact the costs associated with producing differing CONNUMs."  IDM at 20  Put another way, WTTC disregards the fact that DKSC's different products had differing physical characteristics that yielded different

conversion costs.  Thus, Commerce concluded that DKSC reported conversion costs satisfied the second condition of 19 U.S.C. § 1677b(f)(1)(A).  IDM at 20 (citing DKSC's Section B-D Response at D-13 (P.R. 38, C.R. 15); and DKSC's Supplemental D Response at SD-25 to SD-26).  Commerce thus found no basis for reallocating DKSC's conversion costs.  *Id*. at 21.

WTTC nevertheless contends that DKSC's reported costs do not reasonably reflect costs associated with the production and sale of the merchandise because they are not attributable to physical characteristics of the product.  WTTC Br. at 3-4.  Therefore, according to WTTC, "{i}f that {statutory} condition is not met, then the rule is not triggered—and the costs should normally not be calculated based on the exporter's records."  *Id*.  WTTC further asserts that, despite DKSC's reported costs failing to meet the second condition, Commerce still factored them into its calculations, thus incorrectly interpreting and applying the statutory requirement that a producer's costs must also "reflect the costs associated with the production and sale of the merchandise" to be used in calculating costs.  *Id*. at 5 (citing IDM at cmt. 3).

WTTC's claim rests on the erroneous presumption that DKSC's reported conversion costs are not "associated with the production and sale of the merchandise" because they are not "attributable to different physical characteristics of the merchandise."  *Id*. at 4 (citing *Thai Plastic Bags*, 746 F.3d at 1366).  In discussing Commerce's analysis of physical characteristics as the primary factor in a cost analysis, the Federal Circuit in *Thai Plastic Bags* explained that,

> {w}hen other factors influence cost allocation, it is customary for Commerce to adjust a company's reported allocation methodology to reflect costs based solely on physical characteristics.  The relevant statute states that Commerce must consider all available evidence on the proper allocation of costs, but leaves to Commerce's discretion both the meaning of proper allocation and what factors can drive the assignments of those allocations.

*Id*. at 1368 (citing 19 U.S.C. § 1677b(f)(1)(A)) (internal citations and quotation marks omitted).

Thus, although WTTC correctly observes that *Thai Plastic Bags* sustained Commerce's use of physical characteristics in its cost allocation, WTTC wrongly maintains that Commerce misinterpreted the statute because Commerce failed to apply the statutory requirement that a producer's costs must also reflect the costs associated with the production and sale of the merchandise to be used in calculating costs. Contrary to WTTC's argument, Commerce found that DKSC's reported conversion costs reasonably reflected the costs attributable to the physical characteristics of the wind towers. IDM at 20-21. Indeed, Commerce explicitly relied on DKSC's reported physical characteristics in its analysis. *Id.* In addressing WTTC's analysis, Commerce explained that WTTC "compares the variation in average conversion costs per tower section relative to the overall average conversion costs for all tower sections in the cost database" and "does not consider that the CONNUMs vary in complexity with regard to bus bars, conduits, elevators, platforms, and other internal components, all of which are reflected in the CONNUM and impact the costs associated with producing different CONNUMs." *Id.* at 20. Thus, Commerce expressly relied on DKSC's reported physical characteristics and the inherent complexity of these physical characteristics in its analysis. Accordingly, Commerce reasonably determined that the reported costs satisfied the second condition of 19 U.S.C. § 1677b(f)(1)(A). WTTC may disagree with that finding, but "mere disagreement" with Commerce's findings is insufficient to overturn the determination. *Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018).

Lastly, the WTTC invokes *Loper Bright* to question whether Commerce's decision not to adjust DKSC's reported conversion costs was the "best reading" of 19 U.S.C. § 1677b(f)(1)(A). WTTC Br. at 2, 4 (citing *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2254 (2024)). WTTC's "best meaning" argument is unpersuasive. As explained further below, Commerce

made a factual finding that DKSC's conversion costs are "attributable to the physical characteristics of the merchandise." IDM at 20-21.   Rather than a raising statutory question, WTTC merely takes issue with the factual record in contesting the fact that the agency did not make WTTC's preferred adjustment.

### B.    Commerce's Decision Not to Adjust DKSC's Reported Conversion Costs is Supported by Substantial Evidence

WTTC disagrees with Commerce's finding that differences in the internal components are primarily responsible for variations of conversion costs across CONNUMs.  WTTC Br. at 11 (citing WTTC Case Br. at 4 & n.10).  WTTC first refers to its analysis that "compared reported conversion costs for each type of tower {that DKSC} sold during the period of review." *Id*. at 10.  Second, WTTC contends that the weighted-average variation of the conversion costs across all products was [    ]%.  *Id*. (citing WTTC Pre-Preliminary Comments (July 10, 2023), at Ex. 1 (P.R. 62, C.R. 45-46),).  According to WTTC, this variance is similar to that in *Wind Towers from Indonesia* when Commerce adjusted a respondent's costs.  *Id*. at 10 (citing *Utility Scale Wind Towers from Indonesia: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 85 Fed. Reg. 40,231 (Dep't of Commerce Jul. 6, 2020), and accompanying IDM at cmt. 5, available on Westlaw at 85 ITADOC 40231).  WTTC concludes that Commerce unreasonably declined to adjust conversion costs because it departed from past practice whereby Commerce would have adjusted conversion costs similar to previous cases under similar circumstances.  *Id*. at 11. Third, WTTC maintains that "{Commerce} failed to explain how differences in the complexity of various components creates the substantial differences in DKSC's conversion costs among CONNUMs identified by WTTC."  WTTC Br. at 11 (citing WTTC Case Br. at 4 & n.10).  WTTC argues that Commerce also "failed to articulate how variations in the complexity of relatively insignificant components

of a wind tower cause the significant overall weighted average variation of the conversion costs for all CONNUMs." *Id*. To that end, WTTC argues that Commerce's conclusion that bus bars and other components contributing to conversion cost variation was contrary to evidence "because bus bars and elevators {were the same for every CONNUM}. That is, the fields corresponding to bus bars (*i.e.*, field 7) and elevators (*i.e.*, field 9) [▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮]." *Id*. at 12 (citing WTTC Pre-Preliminary Comments at Ex. 1; *see also* DOC Initial Questionnaire at B-12). The WTTC applies the same argument to other components. *Id*.

As an initial matter, WTTC fails to recognize how DKSC reports its conversion costs, and erroneously combines both DKSC's direct and indirect costs to support claims that DKSC's conversion costs have "extreme" variations. WTTC Br. at 10-11. As described above, DKSC "maintains costs on a project-specific basis in the normal course of business." DKSC's Section B-D Response at D-13 (P.R. 38, C.R. 13). These costs are classified into direct and indirect conversion costs. *Id*. Direct costs and indirect costs are distinct. Direct conversion costs are project-specific (that is, directly linked to each CONNUM that represents a wind tower) and account for [▮▮▮▮] percent of total production costs of each wind tower. DKSC's Section D Response at D-13. Indeed, DKSC's "{d}irect {conversion costs are} directly traceable and assigned to the specific projects." DKSC's Supplemental Section D Response at SD-25. WTTC does not contest this statement or Commerce's agreement. DKSC further reported that indirect conversion costs represent common costs that are not directly related to certain projects. *Id*. ("The costs that are not directly linked to projects are classified as indirect costs"). Thus, DKSC's reported conversion costs are overwhelmingly represented by direct conversion costs that are directly linked to specific wind tower projects.

Contrary to WTTC's claim, the purported variance is directly linked to the costs of the characteristics that represent the differences of CONNUMs. DKSC's Section D Response at D-SD-25 ("Direct VOH {conversion costs} is directly traceable and assigned to the specific projects."). Thus, Commerce's finding that "CONNUMs vary in complexity with regard to bus bars, conduits, elevators, platforms, and other internal components, all of which are reflected in the CONNUM and impact the costs associated with producing different CONNUMs," IDM at 20, is supported by DKSC's reporting of its direct conversion costs and the linkage to specific wind tower projects.

Furthermore, [███] percent of DKSC's reported conversion costs represent indirect conversion costs. DKSC's Supplemental Section D Response at Ex. SD-27. DKSC reported that indirect costs comprised [███] percent in scrap offsets, [███] percent in labor costs, [███] percent in variable costs, and [███] percent in fixed overhead costs. *Id*. Indirect conversion costs are allocated first by production process, and then allocated by the production quantity for each project. Projects produced in high-production quantity months typically have lower indirect conversion costs because the costs are allocated over a greater denominator; whereas projects produced in lower-production quantity months typically have higher indirect conversion costs because of the smaller denominator. *Id*. at SD-25-SD-26. "That is, unlike direct {conversion} costs such as raw materials, indirect {conversion} costs (including scrap offsets) are akin to fixed costs that are not impacted by differences in product characteristics." *Id*. at SD-26.

DKSC supported this conversion cost methodology with sample calculations for two CONNUMs. *Id*. at SD-26, Ex. SD-24 and SD-25. DKSC also provided an overview of how it "segregated the combined {conversion costs} in the per-piece cost database between direct {conversion costs} versus indirect {conversion costs} for all CONNUMs." *Id*. at SD-26. DKSC

further reported that "the amount of indirect cost is an insignificant portion of the {total cost of manufacturing}, and most of the direct cost (which comprises the vast majority of the overall {cost of manufacturing}) is traceable directly to individual projects." *Id.* at SD-26; *see also* Ex. SD-27 (reporting the ratio of indirect costs to TOTCOM (total cost of manufacturing). Therefore, indirect costs, which represent a minor cost to the total cost of manufacturing, are allocated to projects on a monthly basis, unlike direct costs which are project specific.

WTTC fails to acknowledge this vital distinction among direct and indirect conversion costs, and instead, lumps the two together. WTTC Pre-Preliminary Cmts. at Ex. 1. Also, WTTC's claim that DKSC's conversion costs "are unrelated to the physical characteristics of the wind towers" is contradicted by DKSC's conversion costs reporting method that links a majority of costs directly to a wind tower project. WTTC Br. at 4. Commerce thus found "no basis to reallocate {} conversion costs based on the analysis the {WTTC} provided." IDM at 21.

Moreover, WTTC relies on outlier data. DKSC reported that each wind tower contains multiple sections. DKSC's Section B-D Response at C-11 (P.R. 37, C.R. 13). Commerce instructed DKSC to report whether each reported sale was of a wind tower or section. Initial Questionnaire at B-8, and C-7. DKSC reported that it "sold towers in the U.S. market during the POR, except for one sale." DKSC's Section B-D Response at C-11 (P.R. 36-38, C.R. 11-16). DKSC further reported that "{d}uring the POR, DKSC sold finished towers in the U.S. market consisting of [███████] sections based on the drawings." DKSC's Section B-D Response at C-15-C-16 (P.R. 37, C.R. 13). Importantly, half of the reported CONNUMs, which predominately represent completed wind towers, and nearly [██] percent of the related sections had [██] variance in the conversion costs. WTTC Pre-Preliminary Comments (Jul. 20, 2023) at Ex. 1 (C.R. 45-46). Of the remaining CONNUMs that possess a cost variance, the majority of

sections (that is, [████] percent) did not have variances above 10 percent.  *Id*.  Moreover,

although two CONNUMs included a conversion cost variance of more than [███] percent, those

CONNUMs represented only [█] sections, or [████] percent of the total number of reported

sections.  *Id*.

      In sum, Commerce reasonably relied on record evidence and determined not to adjust

DKSC's conversion costs, contrary to WTTC's arguments.  WTTC fails to acknowledge DKSC's

conversion cost reporting methodology and that nearly [██] percent of costs are directly linked to

a wind tower project.  WTTC also fails to acknowledge that half of the DKSC's completed wind

towers and the majority of sections of wind towers had [███] variance in its reported conversion

costs.  Accordingly, WTTC's fails to demonstrate that DKSC's reported conversion costs do not

reasonably reflect the costs associated with the production and sale of the subject merchandise as

required by 19 U.S.C. § 1677b(f)(1)(A).

    **C.**    **Commerce Did Not Depart From Its Practice When It Refrained from Adjusting Differences In Conversion Costs**

      Finally, WTTC contends that Commerce unlawfully departed from its established

practice of adjusting a producer's costs if they do not "reasonably reflect the costs associated

with the production and sale of the {subject} merchandise."  *Id*.  WTTC relies on *Wind Towers*

*from Indonesia* to support its claim, maintaining that Commerce has established in that case a

practice of finding that conversion costs reported for wind tower production are unrelated to

physical characteristics and must be adjusted.  WTTC Br. at 6.

      WTTC thus contends that Commerce did not follow its practice to adjust conversion

costs that are unrelated to the physical characteristics of the merchandise.  *Id*.  WTTC further

asserts that Commerce unlawfully deviated from this practice without providing a satisfactory

explanation, citing a three-factor test:  (1) "demonstrat{ing} that an established practice exists,"

(2) "demonstrat{ing} a departure from the practice," and (3) "demonstrat{ing} that the departure is insufficiently explained." *Id*. at 5-6 (citing *BlueScope Steel, Ltd. v. United States*, 719 F.Supp.3d 1357, 1367 (Ct. Int'l Trade 2024)). WTTC thus contends that the Court should "remand{} because Commerce departed from its past practice by accepting DKSC's conversion costs even though those costs are unrelated to the physical characteristics of the wind towers." *Id*. at 6.

As explained above, however, Commerce did not find DKSC's reported conversion costs to be unrelated to the physical characteristics. Instead, Commerce acknowledged the variance identified by WTTC (addressed in detail above) but, nevertheless, found "no basis to reallocate {DKSC's} conversion costs" reporting. IDM at 21. First, Commerce found that DKSC's reported conversion costs were based on its records kept in accordance with home country GAAP. *Id*. at 20. Second, Commerce determined that the variance identified by WTTC did "not consider that the CONNUMs vary in complexity with regard to bus boards, conduits, elevators, platforms, and other internal components, all of which are reflected in the CONNUM and impact the costs associated with producing differing CONNUMs." *Id*. Thus, Commerce has not departed from its practice. Instead, Commerce relied on record evidence to conclude that the facts in this case did not warrant an adjustment because the DKSC's conversion costs reasonably related to the physical characteristics of the wind towers.

In *Wind Towers From Indonesia*, Commerce adjusted reported conversion costs after finding that there were "significant conversion cost differences between CONNUMs that appear to be unrelated to the product's physical characteristics" and that these differences were "solely influenced by production timing" rather than physical characteristics. *Wind Towers from Indonesia* IDM at cmt. 5. WTTC attempts to analogize *Wind Towers From Indonesia* to this

case, claiming that, "here, as in *Wind Towers from Indonesia*, this methodology results in a deviation of more than 10 percent between 'total CONNUM-specific conversion costs per-MT' and 'the overall average.'" WTTC Br. at 8 (citing Comments on DKSC's Initial Questionnaire Responses (Mar. 17, 2023) at 3-4 (P.R. 41, C.R. 25-26)). WTTC asserts that, unlike in *Wind Towers from Indonesia*, Commerce failed to adequately explain this "departure {from established practice}" and adjust DKSC's reported conversion costs. *Id*. WTTC argues that having "'establishe{d} a course of action,' in calculating the costs of production and constructed value under the statute{,}… 'Commerce is obliged to follow' that course of action 'until {it} provides a sufficient, reasoned analysis explaining why a change is necessary.'" *Id*. at 9 (citing *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009)).

But *Wind Towers from Indonesia* is inapposite. Unlike in this case, in *Wind Towers from Indonesia*, Commerce determined that reallocating the respondent's cost was appropriate: "In {*Wind Towers from Indonesia*}, Commerce analyzed the respondent's reported steel material costs and conversion costs and determined that it was appropriate to adjust the respondent's reported conversion costs because the *primary factor driving the conversion cost differences was production timing*." IDM at 20-21 (emphasis added). In contrast, in this case, Commerce undertook a comprehensive review and found that the majority of reported costs were directly attributable to particular projects and those costs that were not directly attributable to particular projects were "insignificant":

> DKSC allocates conversion costs . . . to projects on a monthly basis based on the amount of work performed, *i.e.*, production quantity, which explains the differences in the conversion costs reported between specific CONNUMs and the overall average per-section conversion cost. Moreover, these indirect costs comprise an insignificant portion of the total COM relative to direct costs, which are traceable directly to individual projects.

*Id*. at 19.

Furthermore, "it is an established principle that each administrative review is a separate segment of a proceeding with its own unique facts." IDM at 21 (citing *Shandong Huarong Mach. Co. v. United States*, 29 CIT 484, 491 (Ct. Int'l Trade 2005) (stating "each administrative review is a separate segment of proceedings with its own unique facts. Indeed, if the facts remained the same from period to period, there would be no need for administrative reviews"). Thus, Commerce reasonably found that the facts from *Wind Towers from Indonesia* are distinguishable from the facts in this case and do not warrant the same outcome. IDM at 20-21.

## CONCLUSION

For these reasons, we respectfully request that the Court deny WTTC's motion, sustain Commerce's Final Results in all respects, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/  REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:                                    /s/  STEPHEN C. TOSINI
Jesus Saenz                                         Senior Trial Counsel
Attorney                                              United States Department of Justice
Office of the Chief Counsel for Trade        Civil Division
  Enforcement and Compliance              P.O. Box 480, Ben Franklin Station
United States Department of Commerce       Washington, D.C. 20044
                                                         Tel: (202) 616-5196
                                                         Fax: (202) 305-2062
                                                         Email: stephen.tosini@usdoj.gov
December 18, 2024                               Attorneys for Defendant

19

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this post-hearing brief complies with the word limitations set forth in the Court's Chambers Procedures.  Specifically, excluding those exempted portions as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 5,396 words.  This word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Stephen C. Tosini