NON-CONFIDENTIAL VERSION

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **WIND TOWER TRADE COALITION**<br><br>                              **Plaintiff,**<br>         **v.**<br><br>**UNITED STATES,**<br><br>                              **Defendant,**<br><br>         **and**<br><br>**DONGKUK S&C CO., LTD.,**<br><br>                              **Defendant-Intervenor.** | **Before: Hon. Leo M. Gordon,**<br>            **Senior Judge**<br><br>**Court No. 24-00070**<br><br>**<u>NON-CONFIDENTIAL</u>**<br>**<u>VERSION</u>**<br><br>**Business Proprietary Information**<br>**Removed from Pages: 4-6, 8-9** |

### <u>PLAINTIFF WIND TOWER TRADE COALITION'S REPLY BRIEF</u>

**Alan H. Price, Esq.**
**Robert E. DeFrancesco, III, Esq.**
**Laura El-Sabaawi, Esq.**
**Tatiana Sainati, Esq.**
**John Allen Riggins, Esq.**

**WILEY REIN LLP**
**2050 M Street, NW**
**Washington, DC 20036**
**(202) 719-7000**

*Counsel to Wind Tower Trade Coalition*

**Dated:  February 18, 2025**

Court No. 24-00070                                    NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

Page

I.  ARGUMENT ............................................................................................... 1

  A.  Commerce Improperly Interpreted and Applied 19 U.S.C. § 1677b(f)(1)(A) .......... 1

  B.  Commerce Did Not Articulate a Reasonable Basis for Accepting Dongkuk's
      Misallocated Conversion Costs ..................................................................... 4

II.  CONCLUSION ........................................................................................... 11

Court No. 24-00070

NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amanda Foods (Vietnam) Ltd. v. United States*,
   33 CIT 1407, 647 F. Supp. 2d 1368 (2009) ..................................................................7

*Husteel Co. v. United States*,
   31 CIT 740, 748, F. Supp. 2d 1283 (2007) ...................................................................5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .........................................................................................................5

*Thai Plastic Bags Industries Co., Ltd. v. United States*,
   746 F.3d 1358 (Fed. Cir. 2014) .............................................................................1, 3, 7, 9

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
   716 F.3d 1370 (Fed. Cir. 1378) .....................................................................................7

**Statutes**

19 U.S.C. § 1677b(f)(1)(A) ................................................................................... *passim*

Tariff Act of 1930 Section 773(f)(1)(A) ...........................................................................4

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*,
   51 Fed. Reg. 7,308 (Dep't Commerce Feb. 27, 1996) ....................................................1

*Carbon and Alloy Steel Wire Rod from the Republic of Korea*,
   83 Fed. Reg. 13,228 (Dep't Commerce Mar. 28, 2018) .................................................1

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea*,
   84 Fed. Reg. 32,720 (Dep't Commerce July 9, 2019) ...................................................2

*Common Alloy Aluminum Sheet from Italy*,
   86 Fed. Reg. 13,309 (Dep't Commerce Mar. 8, 2021) ..................................................2

*Common Alloy Aluminum Sheet from Spain*,
   86 Fed. Reg. 13,298 (Dep't Commerce Mar. 8, 2021) ..................................................2

*Utility Scale Wind Towers from Indonesia*,
   85 Fed. Reg. 40,231 (Dep't Commerce July 6, 2020) ...................................................2

**Court No. 24-00070**                                    NON-CONFIDENTIAL VERSION

*Utility Scale Wind Towers from the Republic of Korea*,
89 Fed. Reg. 63 (Dep't Commerce Apr. 1, 2024)......................................................................3

Court No. 24-00070                                    NON-CONFIDENTIAL VERSION

## I.    INTRODUCTION

On behalf of Plaintiff Wind Tower Trade Coalition ("Plaintiff" or "WTTC"), we respectfully submit this brief in reply to the responses filed by Defendant the United States ("Defendant") and Defendant-Intervenor Dongkuk S&C Co., Ltd. ("Dongkuk" or "Defendant-Intervenor"). *See* Def.'s Resp. in Opp'n to Pl.'s Mot. For J. on the Agency R. (Dec. 18, 2024), ECF No. 31 ("Defendant's Br."); Resp. of Dongkuk S&C Co., Ltd. in Opp'n to Pl.'s Rule 56.2 Mot. For J. on the Agency R. (Jan. 15, 2025), ECF No. 33 ("Defendant-Intervenor's Br.").

## II.    ARGUMENT

### A.    Commerce Improperly Interpreted and Applied 19 U.S.C. § 1677b(f)(1)(A)

Commerce failed to consider whether the conversion costs in Dongkuk's records reflected the physical characteristics of the respondent's towers. Commerce may only use a respondent's costs where those costs "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). The Federal Circuit has upheld Commerce's understanding that, when a respondent fails to "base its costs on physical characteristics," those costs are distortive and do not reasonably reflect the respondent's costs. *See Thai Plastic Bags Industries Co., Ltd. v. United States*, 746 F.3d 1358, 1366-67 (Fed. Cir. 2014). In fact, Commerce describes "allocating costs based on physical characteristics" as "the primary factor in a cost analysis." *Id.* at 1366. According to the Federal Circuit, this understanding is consistent with the principle that "physical differences in product 'generally account' for major differences in costs." *See id.* at 1368 (quoting *Antidumping Duties; Countervailing Duties*, 51 Fed. Reg. 7308, 7339 (Dep't Commerce Feb. 27, 1996)); *see also* Issues and Decision Memorandum accompanying *Carbon and Alloy Steel Wire Rod from the Republic of Korea*, 83 Fed. Reg. 13,228 (Dep't Commerce Mar. 28, 2018) available at https://access.trade.gov/Resources/frn/summary/korea-

south/2018-06143-1.pdf at Barcode 3685100-01 (last visited Feb. 14, 2025) ("Carbon and Alloy

Steel From Korea") at cmt. 1 ("The Department does not normally rely on a respondent's reported

costs where cost differentials between CONNUMs are driven by factors other than the CONNUMs

physical characteristics."). Indeed, consistent with this principle, Commerce has routinely adjusted

conversion costs where those costs do not correspond to the physical characteristics of the

merchandise. *See e.g.*, Issues and Decision Memorandum accompanying *Utility Scale Wind

Towers from Indonesia*, 85 Fed. Reg. 40,231 (Dep't Commerce July 6, 2020) available at

https://access.trade.gov/Resources/frn/summary/indonesia/2020-14532-1.pdf    at    Barcode:

3993293-01 (last visited Feb. 14, 2025) at cmt. 5; Issues and Decision Memorandum

accompanying *Common Alloy Aluminum Sheet from Spain*, 86 Fed. Reg. 13,298 (Dep't Commerce

Mar. 8, 2021) available at https://access.trade.gov/Resources/frn/summary/spain/2021-04722-

1.pdf at Barcode 4093374-01 (last visited Feb. 14, 2025) at cmt. 1.C; Carbon and Alloy Steel From

Korea at cmt. 1; Issues and Decision Memorandum accompanying *Common Alloy Aluminum Sheet

from Italy*, 86 Fed. Reg. 13,309 (Dep't Commerce Mar. 8, 2021) available at

https://access.trade.gov/Resources/frn/summary/korea-south/2021-04740-1.pdf    at    Barcode    at

4093339-01 at cmt. 4.E. (explaining that Commerce re-allocated per-unit direct labor, variable

overhead, and fixed overhead costs due to differences related to "differences in rolling time,

production quantities, etc."); Issues and Decision Memorandum accompanying *Certain Hot-

Rolled Steel Flat Products from the Republic of Korea*, 84 Fed. Reg. 32,720 (Dep't Commerce

July 9, 2019) available at https://access.trade.gov/Resources/frn/summary/korea-south/2019-

14482-1.pdf at Barcode 3852821-01 (last visited Feb. 14, 2025) ("Hot-Rolled Steel From Korea")

at cmt. 1 ("Because we find that CONNUM cost differences exist due to the combining of

production from multiple mills, differences in timing of production, production quantities

produced in baches, we have smooth conversion costs."). The Federal Circuit observed that relying on physical characteristics to allocate costs would "promote consistency" and provide a "predictable methodology that is administrative across all investigations and administrative reviews." *Thai Plastic Bags*, 746 F.3d at 1368.

In the underlying proceeding, Dongkuk reported that its indirect conversion costs "are not impacted by differences in product characteristics."  Dongkuk Supp. D Response, CD 37, PD 60 at barcode 4387126-01 (June 8, 2023) ("Dongkuk Supp. D QR") at SD-25. Rather, the indirect costs assigned to each project vary based on the production quantity Dongkuk runs in a given month. *See* Defendant's Br. at 14 (citing Dongkuk Supp. D QR at SD-25 – SD-26) ("Projects produced in high-production quantity months typically have lower indirect conversion costs because the costs are allocated over a greater denominator; whereas projects produced in lower-production quantity months typically have higher indirect conversion costs because of the smaller denominator."). Put otherwise, the amount of indirect conversion costs allocated to each project changes depending on the months in which that project was produced. But timing and production volume are not physical characteristics of the subject merchandise. *See, e.g.*, *Thai Plastic Bags*, 746 F.3d at 1366-67 (upholding Commerce's determination that "production quantities were not physical characteristics that would drive costs"). Commerce chose to ignore that Dongkuk's indirect conversion costs are untethered to the physical characteristics of Dongkuk's merchandise.

In its brief, Defendant attempts to provide a *post hoc* explanation for Commerce's failure to follow 19 U.S.C. § 1677b(f)(1)(A). *See* Defendant's Br. at 9. According to Defendant, "Commerce found that DKSC's reported conversion costs 'reasonably reflect the cost associated with the production and sale of merchandise.'" Defendant's Br. at 9 (citing Issues and Decision Memorandum for the Final Results of the 2021-2022 Administrative Review of the Antidumping

Duty Order on Utility Scale Wind Towers from the Republic of Korea (Dep't Commerce Mar. 1, 2024) at Barcode 4518796-02 ("Final Results IDM") at 20-21). But this was not Commerce's stated finding. Rather, after referencing Section 773(f)(1)(A) of the Tariff Act of 1930, *as amended*, Commerce simply announced that Dongkuk "reported its conversion costs based on its normal books and records." Final Results IDM at 20 (citing Dongkuk's Section B-D, CD 11-16, PD 36-38 at barcode 4326656-01 (Jan. 3, 2023) ("Dongkuk's BDQR") at D-13; Dongkuk Supp. D QR at SD-25 – SD-26). However, the relevant issue is whether Dongkuk's books and records "reasonably reflect the cost associated with the production and sale of the merchandise," 19 U.S.C. § 1677b(f)(1)(A), not whether a respondent has reported its costs consistent with its books and records. Final Results IDM at 20. Indeed, the statute exists precisely for instances where a respondent's books and records do not accurately reflect the cost of producing and selling the subject merchandise. Commerce's decision to rely on Dongkuk's normal books and records was therefore inconsistent with 19 U.S.C. § 1677b(f)(1)(A), precedent, and long-standing agency practice.

**B.    Commerce Did Not Articulate a Reasonable Basis for Accepting Dongkuk's Misallocated Conversion Costs**

Commerce's decision to accept Dongkuk's conversion costs, where differences in CONNUM costs were unrelated to the merchandise's physical characteristics, was not supported by substantial evidence. There is no disagreement that the WTTC's analysis demonstrated variance in conversion costs between CONNUMs. *See* Defendant's Br. at 17 (accepting that "Commerce acknowledged the variance identified by WTTC . . ."). Indeed, the WTTC's analysis demonstrated that [    ]% of Dongkuk's tower sections had conversion costs with significant variation relative to the average, per-section conversion cost and that the average, per-section variation in conversion

costs for all towers was [          ]%. *See* WTTC's Pre-Prelim Comments, CD 45-46, PD 62 at barcode 4405734-01 (July 20, 2023) ("WTTC's Pre-Prelim Comments") at Exhibit 1; *see also* Pl.'s 56.2 Mot. For J. on the Agency R. (Sept. 10, 2024), ECF No. 25 ("Plaintiff Br."). This analysis demonstrated that CONNUMs with [                    ] characteristics had per-section conversion costs that differed significantly. *See* Plaintiff Br. at 12-13. The analysis also demonstrated that CONNUMs with different characteristics had per-section conversion costs that [

]. *See* WTTC's Pre-Prelim Comments at Exhibit 1; Plaintiff Br. at 13.

Yet, Commerce suggested that the WTTC's analysis was deficient because it did not analyze the impact of minor CONNUM characteristics (*i.e.*, bus bars, conduits, elevators, platforms, and other internal components) that allegedly "impact the costs associated with producing differing CONNUMs." *See* Final Decision IDM at 20; *see also* Defendant Br. at 9. Commerce's conclusion was not supported by substantial evidence. *See Husteel Co. v. United States*, 31 CIT 740, 748, F. Supp. 2d 1283, 1291 (2007) (Commerce's decisions are "not supported by substantial evidence where the agency fails to adequately explain the basis on which the agency made its decision."). In the underlying decision, Commerce never explained how it determined that the minor CONNUM characteristics drove the cost variances in the WTTC's analysis. While Defendant now attempts to bolster Commerce's conclusory statement about indirect costs, *see generally* Defendant Br. at 12-15, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). Here, Commerce articulated no such basis for its conclusion.

Indeed, it is not reasonably discernable why Commerce insinuates that minor CONNUM characteristics account for major differences in conversion costs, as this conclusion flatly contradicts record evidence. The WTTC's analysis included the full CONNUM, which reflects all

physical characteristics of the merchandise and allowed the Department to compare conversion costs between CONNUMs. *See* WTTC Pre-Prelim Comments at Exhibit 1. The CONNUMs show that elevators and bus bar characteristics could not produce conversion cost variations because [

]. *See* Plaintiff Br. at 12-13. The WTTC's analysis also demonstrated that there was no relationship between CONNUM conversion costs and the presence or absence of minor physical characteristics—*i.e.*, conduits (the 8th CONNUM characteristic), platforms (the 10th CONNUM characteristic), and internal components (the last CONNUM characteristic). *See* WTTC Pre-Prelim Comments at Exhibit 1; Plaintiff Br. at 12-13; *see also* Defendant-Intervenor's Br. at 5 ("the first three CONNUM characteristics . . . carry the most significance"). Thus, not only was Commerce's conclusion unexplained, but its conclusion about the influence of bus bars, conduits, elevators, platforms, and other internal components contradicts the record.

Rather than supporting Commerce's discussion of these minor CONNUM characteristics, Defendant-Intervenor highlights that "the first three CONNUM characteristics {*i.e.*, Type, Weight, and Height} carry the most significance," and speculates that "Commerce was reasonably aware of and considered this record evidence in reaching its determination." Defendant-Intervenor's Br. at 5. Yet, this is precisely what Commerce failed to do. In its final decision, Commerce acknowledged that the WTTC analyzed conversion cost variations based on section (*i.e.*, the most important CONNUM characteristic) but faulted the WTTC for "not consider{ing} that the CONNUMs vary in complexity with regard to bus bars, conduits, elevators, platforms, and other internal components . . ." Final Results IDM at 20. Nowhere did Commerce mention weight or height. *Compare id.* at 20*, with id.* at 7-8 (explicitly mentioning the physical characteristics of height and weight when deciding to reallocate Dongkuk's steel plate costs). Because the substantial evidence standard requires Commerce to "articulate a satisfactory explanation for its

action," *see Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 1378) (citing *Amanda Foods (Vietnam) Ltd. v. United States*, 33 CIT 1407, 1417, 647 F. Supp. 2d 1368, 1379 (2009), it would be impermissible to assume Commerce considered these physical characteristics where Commerce relied on minor CONNUM characteristics.

Because Commerce did not adequately explain its decision to disregard cost variances, Defendant now attempts to articulate a rationale on Commerce's behalf. First, the Defendant erroneously links Dongkuk's "Direct VOH" costs to the physical characteristics of Dongkuk's merchandise, claiming that these costs reflect differences in the CONNUMs. *See* Defendant Br. at 13-14. Second, Defendant dismisses the impact of "indirect conversion costs" because these costs allegedly "represent a minor cost to the total cost of manufacturing." Defendant Br. at 14-15. As discussed, neither explanation was present in Commerce's underlying opinion, and neither explanation supports Commerce's conclusion.

Defendant claims that "the purported variance {in Direct VOH costs} is directly linked to the costs of the characteristics that represent the differences of CONNUMs" because these costs were reported on a "project-specific" basis. *See* Defendant Br. at 13-14 (linking Commerce's discussion of "bus bars, conduits, elevators, platforms, and other internal components" to direct conversion costs). However, it is not axiomatic that Dongkuk's "project-specific" costs relate to the physical characteristics of Dongkuk's towers. All "cost smoothing" cases involve the reallocation of a company's costs where those costs do not tie to the product characteristics, regardless of whether those costs were project-specific, product-specific, based on production order, or assigned according to any other recording methodology that a company uses in its normal course of business. *See e.g.*, *Thai Plastic Bags*, 746 F.3d at 1362 (upholding Commerce's decision to reallocate labor and overhead costs that were based on "machining times"); Hot-Rolled Steel

From Korea at cmt. 1 (accepting the respondent's normal books and records but adjusting for conversion cost variance caused by respondent's chosen allocation methodology—*i.e.*, "combining of production from multiple mills, differences in timing of production, {and} production quantities produced in batches."). This does not make the reported costs infallible or suitable for Commerce's purposes in calculating a dumping margin. Indeed, in this very case, Commerce acknowledged that Dongkuk's direct material costs for steel plate were unrelated to the physical characteristics of the merchandise, despite being reported on a project-specific basis. *See* Final Results IDM at 6 (adjusting Dongkuk's as-reported, project-specific plate costs). If Defendant and Defendant-Intervenors argument was accepted, Commerce would never be justified in reallocating conversion costs as long as a respondent assigned costs to particular product or project—even where these costs plainly do not correspond to the physical characteristics of the merchandise. Regardless, Defendant, like Commerce below, does not explain how bus bars, conduits, elevators, platforms, or other internal components impact the Direct VOH costs.

Even if variations in Dongkuk's Direct VOH costs were connected to the physical characteristics of the merchandise, indirect conversion costs represent a substantial portion of Dongkuk's conversion costs and are indisputably untethered to the physical characteristics. Defendant claims that "[      ]% of DKSC's reported conversion costs represent indirect conversion costs," *see* Defendant Br. at 14 (citing Dongkuk Supp. D QR at Exhibit SD-27), in an attempt to minimize the importance of the indirect conversion costs. *Id.* at 15. This is incorrect. Indirect conversion costs represent [      ]% of Dongkuk's <u>total manufacturing costs</u>, *see* Dongkuk Supp. D QR at SD-26, Exhibit SD-27; *see also* Dongkuk's BDQR at D-36. Indirect VOH costs are also a [          ] of Dongkuk's total variable overhead costs. *See* Dongkuk Supp. D QR at Exhibit SD-25 (showing that indirect VOH costs for Dongkuk's sample projects

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**    **NON-CONFIDENTIAL VERSION**

were [    ]% and [    ]% of overhead costs). *Id.* Thus, misallocated indirect conversion costs alone have a meaningful impact on total reported costs.

Defendant-Intervenor's attempts to reinforce Commerce's lack of explanation also fail. Defendant-Intervenor alleges that "{t}o argue that {labor and overhead} costs are not related to the 'production' of the merchandise is baseless and absurd." Defendant-Intervenor Br at 6. This misconstrues the WTTC's argument. Plaintiff does not dispute that "{e}very manufacturer incurs costs related to labor and overhead." *See id.* at 6. The relevant question, however, is whether the <u>respondent's records</u> "reasonably reflect the costs associated with the production and sale of the merchandise." *See* 19 U.S.C. § 1677b(f)(1)(A). As discussed, Commerce has interpreted this law to require that "conversion costs reflect cost differences attributable to different physical characteristics, which the U.S. Court of Appeals for the Federal Circuit has upheld as "a predictable methodology that is administrable across all investigations and administrative reviews." *Thai Plastic Bags*, 746 F.3d at 1368. Here, conversion costs do not "reflect cost differences attributable to different physical characteristics" and, therefore, do not "reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* at 1368, 1361.

Defendant-Intervenor also misconstrues the WTTC's comparison of per-section conversion costs between CONNUMs, claiming the WTTC "failed to consider the different physical characteristics of finished wind towers" by comparing conversion costs on a per-section basis. Defendant-Intervenor Br. at 7. Dongkuk sells towers with different numbers of total sections and sold different quantities of each CONNUM. The WTTC's analysis enabled Commerce to observe the CONNUM characteristics and conversion cost variance between CONNUMs on a uniform basis. *See* WTTC Pre-Prelim Comments at Exhibit 1. Such an analysis demonstrated the

9

substantial variations in the conversion costs for each CONNUM, which do not track the CONNUMs' corresponding physical characteristics.

In sum, in addition to its failure to correctly interpret and apply 19 U.S.C. §1677b(f)(1)(A), Commerce failed to articulate a rationale for its decision to ignore the conversion costs variances in the WTTC's analysis. The determination was not explained or supported based on record evidence developed in this review and ignored Dongkuk's own characterization of a significant portion of its conversion costs as unrelated to the physical characteristics of the merchandise.

Court No. 24-00070                                    NON-CONFIDENTIAL VERSION

## III.    <u>CONCLUSION</u>

For the reasons detailed above and in our opening brief, we respectfully submit that this Court should remand the Department's Final Results in the 2021-2022 administrative review of utility scale wind towers from the Republic of Korea for further consideration consistent with the arguments made in our briefing.

Respectfully submitted,

*/s/ Robert E. DeFrancesco, III*

Alan H. Price, Esq.
Robert E. DeFrancesco, III, Esq.
Laura El-Sabaawi, Esq.
Tatiana Sainati, Esq.
John Allen Riggins, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to Wind Tower Trade Coalition*

Dated:  February 18, 2025

**Court No. 24-00070**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to the Scheduling Order (July 18, 2024), ECF No. 21, the undersigned certifies that this brief complies with the word limitation requirement.  The word count for The Wind Tower Trade Coalition's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 2,786 words.

<u>*/s/ Robert E. DeFrancesco, III*</u>
(Signature of Attorney)

<u>Robert E. DeFrancesco, III</u>
(Name of Attorney)

<u>Wind Tower Trade Coalition</u>
(Representative Of)

<u>February 18, 2025</u>
(Date)