Slip Op. 25-148

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| WIND TOWER TRADE COALITION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>DONGKUK S&C CO., LTD.,<br><br>Defendant-Intervenor. | Before: Leo M. Gordon, Judge<br><br>Court No. 24-00070 |

**OPINION and ORDER**

[U.S. Department of Commerce's final results sustained in part and remanded in part.]

Dated: December 2, 2025

Maureen E. Thorson, Wiley Rein LLP, of Washington, D.C., argued for Plaintiff Wind Tower Trade Coalition. With her on the brief were Alan H. Price, Derick G. Holt, Jeffrey O. Frank, John A. Riggins, Laura El-Sabaawi, Robert E. DeFrancesco, III, and Tatiana Sainati.

Sosun Bae, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director, and Stephen C. Tosini, Senior Trial Counsel, Civil Division, U.S. Department of Justice. Of counsel were Jesus Nieves Saenz and Charlie Chung, Attorneys, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Jarrod M. Goldfeder, Trade Pacific PLLC, of Washington, D.C., argued for Defendant-Intervenor Dongkuk S&C Co., Ltd. With him on the brief were MacKensie R. Sugama and Robert G. Gosselink.

Gordon, Judge: This action involves the U.S. Department of Commerce's ("Commerce") final results in the Section 751 administrative review of utility scale wind towers from the Republic of Korea.  See Utility Scale Wind Towers from the Republic of Korea, 89 Fed. Reg. 16,544 (Dep't of Commerce Mar. 7, 2024), as corrected in Utility Scale Wind Towers from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2021-2022; Correction, 89 Fed. Reg. 22,372 (Dep't of Commerce Apr. 1, 2024), and accompanying Issues and Decision Memorandum ("Decision Memorandum").

Before the court is Plaintiff Wind Tower Trade Coalition's USCIT Rule 56.2 motion for judgment on the agency record.  See Revised Confidential Wind Tower Trade Coalition Rule 56.2 Mot. for J. on Agency R. ("Pl.'s Br."), ECF No. 25[1]; see also Confidential Def.'s Resp. in Opp'n to Pl.'s Mot. for J. upon the Agency R. ("Def.'s Resp."), ECF No. 31; Confidential Resp. of Dongkuk S&C Co., Ltd. ("Dongkuk") in Opp'n to Pl.'s Rule 56.2 Mot. for J. on Agency R. ("Def.-Intervenor's Resp."), ECF No. 33; Confidential Pl. Wind Tower Trade Coalition's Reply ("Pl.'s Reply"), ECF No. 35. The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).  For the reasons set forth below, the court sustains Commerce's determination in part and remands in part.

---

[1] All citations to the parties' briefs and the agency record are to their confidential versions unless otherwise noted.

## I. Standard of Review

The court sustains Commerce's "determination[s], finding[s], or conclusion[s]" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); see also Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

Substantial evidence also has been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr. & Richard Murphy, Admin. L. and Prac. § 9.24[1] (3d ed. 2025).  Therefore, when addressing a substantial evidence issue, the court analyzes whether the challenged agency action is "reasonable

given the circumstances presented by the whole record."  8A <u>West's Fed. Forms</u>, Nat'l

Cts. § 3.6 (5th ed. 2025).

## II. Discussion

This action continues the sparring between Plaintiff and Commerce about the

proper method of calculating: (1) adjustments for differences in merchandise in sales

comparisons and (2) the difference in the cost of production between the merchandise

sold to the U.S. market and that sold in the home market based on their respective

physical characteristics.

At the beginning of the underlying investigation, Commerce identified 11 physical

characteristics[2] that are the most significant in differentiating costs between

---

[2] Those characteristics are:

| Physical Characteristic | Description |
| --- | --- |
| 1. Type | Whether the product is a complete tower or section |
| 2. Weight | Weight of tower/section |
| 3. Height | Height of tower/section |
| 4. Tower Sections | Number of tower sections for the particular sale |
| 5. Type of Paint | The top paint coat for the tower/section |
| 6. Metalizing | The degree of metalizing of the tower/section |
| 7. Elec. Conduit-Bus Bars | Whether the tower/section contains bus bars |
| 8. Elec. Conduit-Power | Whether the tower/section contains power cables |

(footnote continued)

those products.  These physical characteristics, i.e., CONNUMs,[3] define: (1) the unique products for sales comparison purposes and (2) the level of detail within each physical characteristic, thereby enabling Commerce to make the most similar price-to-price comparisons.

In certain circumstances in an antidumping duty investigation, Commerce is to determine whether the sales of the foreign like product were made at less than the cost of production.  Commerce calculates production costs "based on the records of the exporter or producer of the merchandise, if such records . . . reasonably reflect the costs associated with the production and sale of the merchandise."  19 U.S.C. § 1677b(f)(1)(A).  A respondent's reported production costs "reasonably reflect the costs associated with the production of the merchandise" if they reflect meaningful cost differences attributable to the finished product's different physical characteristics.  See Thai Plastic Bags

---

| 9. Lift | Whether an elevator is attached to the tower/section |
| 10. Platform | The number of platforms in the tower/section |
| 11. Internal Components | Whether there were other internal components. |

Commerce Memorandum, re: Administrative Review of the Antidumping Duty Order on Utility Scale Wind Towers from the Republic of Korea (Korea): Request for Information (Nov. 4, 2022), C.R. Tab 3.

[3] A "CONNUM" is a contraction of the term "control number" and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding).  All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of price comparison.  The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the subject merchandise.

Indus. Co. v. United States, 746 F.3d 1358, 1368 (Fed. Cir. 2014) (explaining that "physical differences in products 'generally account' for major differences in costs" and "[r]eliance on physical characteristics, because of its ability to promote consistency, is a predictable methodology that is administrable across all investigations and administrative reviews").  If a respondent's reported production costs are not reasonable, "Commerce has the authority to 'adjust costs appropriately to ensure that [the costs] are not artificially reduced.'" Id. at 1366–67 (internal citations omitted).

Here, included in production costs reported to Commerce are conversion costs, which are the total incurred costs necessary to convert steel plates into the subject wind towers.  Conversion costs are the sum of: (1) direct labor costs, (2) variable overhead costs, and (3) fixed overhead costs.  Letter from Trade Pacific PLLC to Sec'y Commerce, re: Utility Scale Wind Towers from the Republic of Korea – DKSC's Supplemental Section D Questionnaire Response (June 8, 2023), C.R. Tab 8 at SD-25–SD-27.  In reporting conversion costs to Commerce, Dongkuk subdivided the variable overhead costs by reporting them in two categories: (1) direct variable costs that were linked to specific projects or (2) indirect variable costs that were "not impacted by differences in product characteristics."  Id.  Commerce found Dongkuk's reported conversion costs to be appropriate based on Commerce's calculation methodologies and did not adjust those costs in the final results.  Decision Memorandum at 20–21.

Plaintiff raises the following challenges: (1) that Commerce's interpretation of 19 U.S.C. § 1677b(f)(1)(A) was "not in accordance with law" because the agency "misinterpreted the statutory language"; (2) that Commerce departed from an established

practice in refusing to adjust Dongkuk's conversion costs[4]; and (3) that Commerce failed to adequately explain its finding that CONNUMs vary in complexity with regard to internal components.  Pl.'s Br. at 1–2.

## A. Misinterpretation of the Statute

Initially, Plaintiff argues that Commerce's determination was not in accordance with law because it misinterpreted the 19 U.S.C. § 1677b(f)(1)(A) requirement that "[c]osts shall normally be calculated based on the records of the exporter or producer . . . if such records . . . reasonably reflect the costs associated with the production and sale."  Pl.'s Br. at 3–5.   Plaintiff contends that the statute's "if" clause requirement–records that "reasonably reflect the costs associated with production and sale"–is best interpreted as records that "reflect costs attributable to the physical characteristics of the merchandise." Id. at 4.  Defendant argues that "[r]ather than raise a statutory question, [Plaintiff] merely takes issue with the factual record" as to Commerce's acceptance of Dongkuk's reported conversion costs.  Def.'s Resp. at 12.  At oral argument, Plaintiff conceded that there is no dispute as to the meaning of the statute, a legal challenge. Oral Arg. at 15:02–18:48 (June    13,    2025),    https://www.cit.uscourts.gov/sites/cit/files/20250613-24-00070-

---

[4] Plaintiff invokes Utility Scale Wind Towers From Indonesia: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances, 85 Fed. Reg. 40,231 (Dep't of Commerce July 6, 2020) ("Wind Towers from Indonesia"), and accompanying Issues and Decision Memorandum at cmt. 5 to demonstrate an established practice.

LMG.mp3.[5]  Rather, they diverge on the application of the statute in this proceeding, which is a substantial evidence challenge.  Id.

Given this concession, the court deems this challenge withdrawn and will turn its attention to the remaining issues.  See e.g., Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States, 49 CIT ___, ___, Ct. No. 23-00264, 2025 WL 2092386, at *4 (July 21, 2025) ("Although the meaning of a statutory term is a legal question, see Loper Bright Enters. v. Raimondo, 603 U.S. 369, 391–92 (2024), the application of that term to the record is a factual determination for the agency.").

_____

[5] At oral argument, the following exchange occurred with Plaintiff's counsel:

> The court: So, I guess my question to you is: [misinterpretation and misapplication] are two different things, right?  A misinterpretation is a legal question driven by Loper Bright, and a misapplication is [that] there is no dispute as to what the statute means, but looking at the facts and the circumstances of this case, the agency erred in applying the statute, right?  So, my question to you is: It can't be both.  It's got to be one or the other, right? . . . What am I dealing with here?

> Plaintiff: Yes, Your Honor.  I think we're in the second case here where it's a misapplication rather than misinterpretation. . . .

> . . .

> The court: So, we don't have a Loper Bright issue?

> Plaintiff: No.  I don't believe we have a Loper Bright issue. I think we are in fact–now granted the way the Commerce Department framed its explanation gave us some pause about whether the agency was reading the statute correctly, but the way the government has responded does not take on any argument that there is in fact some distinct way that is different from the way [Plaintiff] reads the statute, that the Commerce Department is interpreting the statute here.  So, this to my mind, after the briefing from the parties, is squarely a misapplication case, including substantial evidence and whether the agency explained and supported its viewpoint.

## B. Departure from Commerce's Established Practice

Plaintiff argues that Commerce departed from an established practice of adjusting a producer's costs that do not reasonably reflect the costs associated with the merchandise's physical characteristics and failed to provide a satisfactory explanation for that departure.  Pl.'s Br. at 5–9 (citing Wind Towers from Indonesia; BlueScope Steel, Ltd. v. United States, 48 CIT ___, ___, 719 F. Supp. 3d 1357, 1367 (2024); Thai Plastic Bags, 746 F.3d at 1366).  Plaintiff further argues that Dongkuk allocated conversion costs by production quality on a monthly basis that resulted in deviations of more than 10 percent of CONNUM-specific conversion costs per metric ton and the overall average. Id. at 8.  Plaintiff likens this to another proceeding where Commerce adjusted a respondent's reported conversion costs after Commerce's analysis found deviations of more than 10% and concluded that the costs were "solely influenced by production timing."  Id. (citing Wind Towers from Indonesia at cmt. 5).  Therefore, in Plaintiff's view, Commerce should have followed this practice.

Defendant contends that Plaintiff has not shown a departure from an established practice.  Def.'s Resp. at 18.  Defendant agrees with Plaintiff that in the Indonesian proceeding, Commerce found that the reported conversion cost differences related solely to the production timing.  Nevertheless, it maintains that, here, the conversion cost differences were related to the physical characteristics.  Id.  Defendant-Intervenor similarly argues that Plaintiff's reliance on the Indonesian proceeding is misplaced because that determination did not focus on the allocation of direct and indirect variable costs, but instead focused solely on the reallocation of direct material costs when cost

variances were unrelated to the physical characteristics. Def.-Intervenor's Resp. at 6–8. Defendant-Intervenor disputes Plaintiff's contention that an established practice exists. To the contrary, Defendant-Intervenor points to the underlying investigation, the prior Section 751 review, and other administrative determinations as examples where Commerce accepted and used the same conversion cost methodology as it did in this proceeding. Id. (citing Carbon and Alloy Steel Threaded Rod from India: Final Results of Antidumping Duty Administrative Review, 2021-2022: 88 Fed. Reg. 75,265 (Dep't of Commerce Nov. 2, 2023), and accompanying Issues and Decision Memorandum, at cmts. 2, 3; Certain Steel Nails from Malaysia: Final Determination of Sales at Less Than Fair Value, 80 Fed. Reg. 28,969 (Dep't of Commerce May 20, 2015), and accompanying Issues and Decision Memorandum, at cmt. 3).

The court notes that an established practice does not preclude an agency from departing from its practice, "at least where [the agency] explains the reason for its departure." Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1373 (Fed. Cir. 2003). However, before the court can determine whether an unlawful departure occurred, the party seeking relief must first "show the existence of a uniform and established procedure that would lead a party, in the absence of a notification of a change, reasonably to expect adherence to the established practice or procedure." Goodluck India Ltd. v. United States, 47 CIT ___, ___, 670 F. Supp. 1353, 1374 (2023) (internal citations and quotations omitted); BlueScope Steel, 48 CIT at ___, 719 F. Supp. 3d at 1367. Against this required showing is the strong presumption that each determination rests on its own unique facts and that "an agency's exercise of

discretion on a case-by-case and fact specific basis complicates any efforts to divine rules from past agency practice." Id. (internal citations and quotations omitted).

Fatally, Plaintiff makes no showing of its alleged established practice. In its reply, Plaintiff raises three additional examples of Commerce adjusting conversion costs (per-unit direct labor, variable overhead, and fixed overhead) due to differences in production time or quantities, where the costs did not correspond to physical characteristics. Pl.'s Reply at 2–3 (internal citations omitted). These additional examples are unpersuasive, however, as "[p]rior determinations by the [agency] with regard to one industry typically provide little guidance for later determinations with regard to different industries." Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007); BlueScope Steel, 48 CIT at ___, 719 F. Supp. 3d at 1368. Commerce has previously used the conversion cost calculation in issue in other administrative determinations, as well as in the underlying investigation, the first Section 751 review, and now the second review. Further, Commerce reasonably explained that the facts of this case are distinguishable from Wind Towers from Indonesia because there, "the primary factor driving the conversion cost differences was production timing," not physical characteristics. Decision Memorandum at cmt. 3. Therefore, Plaintiff has failed to demonstrate that Wind Towers from Indonesia constituted an established practice from which Commerce departed. BlueScope Steel, 48 CIT at ___, 719 F. Supp. 3d at 1368.

### C. Impact of Internal Components on CONNUMs and Reported Conversion Costs

Finally, Plaintiff challenges that, by accepting Dongkuk's reported conversion costs, Commerce "failed to establish a 'connection between the facts found' . . . and the choice the Department made."  Pl.'s Br. at 11.  Plaintiff contends that its proffered conversion costs analysis "'reasonably reflect[ed] the costs associated with the production and sale of the merchandise'" because it relied on the first enumerated CONNUM characteristic, *i.e.*, tower sections.  Pl.'s Reply at 9 (citing 19 U.S.C. § 1677(f)(1)(A)).  In Plaintiff's view, Commerce's explanation to not accept its conversion costs based on tower sections was deficient because Commerce: (1) did not address Plaintiff's reliance on tower sections, no less the other two significant CONNUM characteristics, <u>i.e.</u>, weight and height, and (2) only criticized Plaintiff's failure to analyze the impact of certain internal components.  <u>Id.</u> at 7.  Therefore, Plaintiff maintains that "Commerce failed to articulate a rationale for its decision to ignore the conversion cos[t] variances in [Plaintiff's] analysis," and that Government's counsel now attempts to impermissibly articulate a rational regarding material differences in direct and indirect variable costs that Commerce did not articulate.  <u>Id.</u> at 10.

Defendant maintains that Plaintiff's analysis incorrectly asserted extreme variances in conversion costs because Plaintiff: (1) failed to recognize how Dongkuk reported its conversion costs, and (2) erroneously combined Dongkuk's direct and indirect variable costs.  Def.'s Resp. at 13.  Defendant argues that, here, direct variable costs are project-specific, thus directly linked to each CONNUM, whereas indirect variable costs

are common costs not directly linked to a specific project, are akin to fixed costs, and are insignificant.  Id. at 13.

The court concurs that Defendant's offered explanation to accept Dongkuk's reported conversion costs, rather than Plaintiff's, is inadequate for the court to determine whether the record reasonably supports Commerce's determination. See Decision Memorandum at cmt. 3    Commerce failed to explain why Dongkuk's reported conversion costs were appropriate, save for circular reasoning that "Dongkuk reported its conversion costs based on its normal books and records." Id. ("In this case, we have considered the arguments and evaluated the appropriateness of such an adjustment as it related to Dongkuk's reported data, its reporting methodologies, and its own cost accounting system.  As a result, we continue to find that Dongkuk's reporting of its conversion costs in this review is appropriate and we have made no changes to these costs for the final results.").    Additionally, Commerce did not explain why Plaintiff's conversion costs analysis utilizing the first CONNUM characteristic (tower sections) is inappropriate, save for a conclusory statement that "[Plaintiff] does not consider that the CONNUMs vary in complexity with regard to bus bars, conduits, elevators, platforms, and other internal components." Id.  In its Decision Memorandum, Commerce did not address the first three enumerated CONNUM characteristics (tower sections, weight, and height), nor did it explain why internal components' complexities are appropriately reflected in Dongkuk's reported conversion costs.  Id.

Defendant argues that Commerce's determination that CONNUMs vary in complexity with regard to internal components "is supported by [Dongkuk's] reporting of

its direct conversion costs and the linkage to specific wind tower projects." Def.'s Resp. at 14.  However, Defendant's explanation as to the significance in differences between direct and indirect variable conversion costs is not reflected within Commerce's Decision Memorandum.  This presents a post hoc rationalization by agency counsel, and not the reasoning of the agency itself.  See Motor Vehicle Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 50 (1983) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action.")).

Consequently, the Decision Memorandum fails to set forth how Commerce's explanation alone could lead a reasonable mind to conclude that Dongkuk's reported conversion costs were appropriate because CONNUMs vary in complexity with regard to internal components, despite evidence to the contrary.  The court therefore remands to Commerce.

### III. Conclusion

For the foregoing reasons, it is hereby:

**ORDERED** that Commerce's final results as to its treatment of conversion costs is remanded to Commerce for further explanation, and if appropriate, reconsideration of its cost analysis under 19 U.S.C. § 1677b(f)(1)(A); it is further

**ORDERED** that Commerce shall file its remand results on or before Wednesday, January 28, 2026; and it is further

Court No. 24-00070                                                Page 15

     **ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.


/s/ Leo M. Gordon
_____
Judge Leo M. Gordon

Dated: December 2, 2025
      New York, New York